IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| HILDA L. SOLIS, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 08-0174-CV-W-ODS |
| FIRSTCALL STAFFING SOLUTIONS, INC.; GINA M. HILTON, individually; and BEATRICE GRAY, individually, | ) ) ) ) ) | |
| Defendants. | ) | |

ORDER AND OPINION (1) GRANTING IN PART AND DENYING IN PART PLAINTIFF HILDA L. SOLIS' MOTION FOR SUMMARY JUDGMENT; (2) DENYING DEFENDANTS FIRST CALL STAFFING SOLUTIONS, INC. AND GINA M. HILTON'S MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING DEFENDANT BEATRICE GRAY'S MOTION FOR SUMMARY JUDGMENT

Pending is a motion for summary judgment (Doc. # 76) filed by Plaintiff Hilda L. Solis, Secretary of Labor (the Secretary), United States Department of Labor (DOL). Also pending are Defendant Beatrice Gray's motion for summary judgment (Doc. # 79) and Defendants FirstCall Staffing Solutions, Inc. (FirstCall) and Gina M. Hilton's motion for summary judgment (Doc. # 80). Plaintiff's motion is granted in part and denied in part. Defendants' motions are denied.

I. BACKGROUND

This case involves 10 developmentally disabled persons (Clients) who received services from the Kansas City Regional Center (KCRC), an office operated by the Division of Developmental Disabilities for the State of Missouri Department of Mental Health. KCRC serves developmentally disabled individuals who are substantially limited

in their ability to live independently.

KCRC administered the Medicaid Home and Community-Based Waiver Program. One of the options under this program was a "Comprehensive Waiver," which provided Clients an opportunity to live in a community setting rather than a long term care facility known as an Intermediate Care Facility for Mental Retardation (ICF/MR). After Clients chose to participate in the Comprehensive Waiver, FirstCall contracted with KCRC to provide "Individualized Supported Living Services" (supported services) to Clients. The supported services were paid for entirely by Medicaid and included assistance with routine household chores, transportation to and from appointments, accompaniment to activities or into the community, and the provision of care, skill, and training.

At the time that they received supported services from FirstCall, Clients–none of whom were related–lived in one of four apartments at Sterling Creek Apartments (Sterling Creek) in Independence, Missouri. Between March 10, 2006 and June 28, 2008, some FirstCall employees who worked at Sterling Creek worked over 40 hours per week but were not paid overtime wages. The Secretary alleges that FirstCall, Hilton (FirstCall's President and Chief Executive Officer), and Gray (FirstCall's Vice President and Chief Operating Officer) violated the Fair Labor Standards Act of 1938, as amended (29 U.S.C. § 201 *et seq.*) (FLSA) by withholding $95,904.53 in overtime compensation. Defendants deny liability, claiming, among other things, that the employees were exempt from FLSA's overtime requirements.

## II. DISCUSSION

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmovant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Sipe v. Workhorse Custom Chassis*, *LLC*, 572 F.3d 525, 528 (8th Cir. 2009).

### A. Employer's Duty to Pay Overtime

FLSA requires employers to pay employees overtime if the employees work over 40 hours per week. 29 U.S.C. § 207(a)(1). One exemption to this requirement is for employees "employed in domestic service employment to provide companion services for individuals who (because of age or infirmity) are unable to care for themselves (as such terms are defined and delimited by regulations of the Secretary)." 29 U.S.C. § 213(a)(15). Congress created this exemption–known as the "companionship exemption"–"'to enable guardians of the elderly and disabled to financially afford to have their wards cared for in their own private homes as opposed to institutionalizing them.'" *Welding v. Bios Corp.*, 353 F.3d 1214, 1218 (10th Cir. 2004) (citation omitted). Like all exemptions to FLSA, the "companionship exemption" is subject to a narrow construction. *Buckner v. Florida Habilitation Network, Inc.*, 489 F.3d 1151, 1154 (11th Cir. 2007).

Pursuant to its authority under 29 U.S.C. § 213(a)(15), DOL promulgated a regulation defining "domestic service employment" as "services of a household nature performed by an employee in or about a *private home* (permanent or temporary)." 29 C.F.R. § 552.3 (emphasis added). DOL also promulgated another regulation further expanding on its definition of "domestic service employment." In relevant part, this regulation provides:

> (a) The definition of domestic service employment contained in § 552.3 is derived from the regulations issued under the Social Security Act (20 CFR 404.1057[1]) and from "the generally accepted meaning" of the term. Accordingly, the term includes persons who are frequently referred to as "private household workers." See S. Rep. 93-690, p. 20. *The domestic service must be performed in or about the private home of the employer whether that home is a fixed place of abode or a temporary dwelling as in the case of an individual or family traveling on vacation.* A separate and distinct dwelling maintained by an individual or a family in an apartment

---

[1] The Social Security Administration's regulation defines "domestic service" as "work of a household nature done by you in or about a private home of the employer." 20 C.F.R. § 404.1057(b). Unlike DOL, the Social Security Administration's definition of "private home" excludes temporary dwellings. *See* 20 C.F.R. § 404.1057(b) (defining "private home" as "a fixed place of residence of a person or family").

3

> house, condominium or hotel may constitute a private home.
>
> (b) Employees employed in dwelling places which are primarily rooming or boarding houses are not considered domestic service employees. The places where they work are not private homes but commercial or business establishments. Likewise, employees employed in connection with a business or professional service which is conducted in a home (such as a real estate, doctor's, dentist's or lawyer's office) are not domestic service employees.

29 C.F.R. § 552.101 (emphasis added). Since Congress delegated definitional authority to DOL with 29 U.S.C. § 213(a)(15), DOL's regulations defining "domestic service employment" are entitled to deference. *See Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 649 (8th Cir. 2009).

Defendants claim FirstCall employees qualified for the companionship exemption under 29 U.S.C. § 213(a)(15) because they engaged in "domestic service employment" by providing supported services to Clients at Sterling Creek. The Secretary counters that FirstCall's employees did not perform "domestic service employment" in Clients' apartments at Sterling Creek because those apartments did not constitute "private homes" under 29 C.F.R. § 552.3.

Neither the Supreme Court nor the Eighth Circuit has interpreted the meaning of the term "private home" under 29 C.F.R. § 552.3. However, the Tenth Circuit has done so and has noted that DOL's definition of "private home" "'exists along a continuum,'" at one end of which is "'[a] traditional family home in which a single family resides,'" and at the other end of which is "'an institution primarily engaged in the care of the sick, the aged, the mentally ill or a boarding house used for business or commercial purposes.'" *Welding*, 353 F.3d at 1217 (citation omitted). A determination where a particular dwelling exists on this continuum is "'fact-specific and to be made on a case-by-case basis.'" *Id.* at 1218 (citation omitted). "[T]he key inquiries are who has ultimate management control of the living unit and whether the living unit is maintained primarily to facilitate the provision of assistive services." *Id.* at 1219.

The Tenth Circuit has set forth the following nonexclusive list of factors a court should consider in determining whether a dwelling constitutes a "private home": (1)

4

whether the recipient of the services lived in the living unit as his or her private residence before beginning to receive services; (2) who owns the living unit; (3) who manages and maintains the residence; (4) whether the recipient of the services would be allowed to live in the unit if he or she were not contracting with provider for services; (5) the relative difference in cost/value of services provided and total cost of maintaining the living unit, including government subsidies; and (6) whether the service provider uses any part of residence for the provider's own business purposes. *Welding*, 353 F.3d at 1219-20 (citations omitted). The Court will apply each of these factors in turn.[2]

**(1) Whether the recipient of the services lived in the living unit as his or her private home before beginning to receive services**. This factor is significant because "the mere onset of services is not likely to change the nature of the living unit." *Welding*, 353 F.3d at 1219 (citation omitted). Here, some Clients moved into Sterling Creek at the same time they began receiving supported services from FirstCall, while others received supported services from other service providers at Sterling Creek and other locations before FirstCall. However, *no* Clients ever lived at Sterling Creek without the assistance of a service provider.

Defendants contend that this factor "requires an analysis of whether the services provided by *FirstCall* were tied to the consumer's choice to live at Sterling Creek Apartments." However, this is not the question the factor poses. The question is whether Clients ever lived at Sterling Creek without assistance from a service provider, because if they had it would appear that Clients' apartments were private homes. Since they did not, this factor weighs in the Secretary's favor.

**(2) Who owns the living unit**. "Ownership is significant because it evidences control." *Welding*, 353 F.3d at 1219. The parties agree that neither Clients nor FirstCall

---

[2] In arguing that they are entitled to summary judgment, Defendants assert that "the only issue is whether having 'two or three unrelated' roommates somehow changes the characterization of an apartment from a 'private home' to a 'rooming or boarding house.'" Defendants base this assertion not on any legal authority, but on a statement made by a DOL investigator prior to suit that a "private residence . . . would not include any client living in an apartment with two or three unrelated clients." The DOL investigator's statement is not binding in this case.

5

owned Sterling Creek. Rather, Clients were tenants at the apartment complex. "If the client or the client's family leases the unit directly from the owner, that is some indication that it is a private home, though not as powerful an indication as ownership. If the service provider leases the unit, that is some indication that it is not a private home." *Welding*, 353 F.3d at 1219. Here, Clients' names appeared on the leases. Although Clients did not always sign the leases, this does not change the fact that they–not FirstCall or any other entity–had legal possession of the property. Since Clients had superior legal rights to the apartments, this factor weighs in favor of a finding that the apartments were "private homes."

      **(3) Who manages and maintains the residence**. This factor asks "who provides the essential things that the client needs to live there, such as paying the mortgage or rent, paying for gas, electricity, and water, providing clean linens and clothes, and providing food?" *Welding*, 353 F.3d at 1219. Here, payment of rent and utilities came from Clients' SSI and disability benefits; however, the process of paying these expenses is not what one typically would find with a private residence. FirstCall set up one bank account in the name of FirstCall into which KCRC or the Department of Mental Health transferred funds derived from Clients' disability and SSI payments. FirstCall withdrew money from this account to pay rent and utilities with no client involvement. KCRC also determined an amount of money which would be provided to the consumers as a personal allowance or personal spending, and FirstCall would withdraw that amount from the bank account as well.

      Moreover, FirstCall–not Clients or their guardians–was responsible for contacting Sterling Creek and obtaining the leases once the decision was made that Clients would live there. Also, it was FirstCall employees who were responsible for notifying Sterling Creek's apartment manager if repairs in the living units were necessary, not Clients.

      To the extent they were able,[3] Clients completed household chores and retained some control over what they ate and the groceries that were purchased. Nevertheless,

---

     [3] Some Clients required 24 hour assistance with no alone time and could neither cook nor clean, while other Clients were more independent. However, all Clients required at least 16 hours of staffing each day.

the uncontroverted facts show that without FirstCall's assistance, Clients would not have been able to provide for themselves at Sterling Creek.[4] FirstCall ultimately was responsible for providing the things Clients needed for daily living. Thus, this factor weighs "strongly" against the apartments being considered "private homes." *Welding*, 353 F.3d at 1220.

**(4) Whether the recipient of the services would be allowed to live in the unit if he or she were not contracting with the provider for services**. This factor is "relevant to the issue of control." *Welding*, 353 F.3d at 1220. Before living at Sterling Creek, Clients (or their guardians) were given a choice: Clients either could live in an institutional setting (ICF/MR) or in a community setting ("Comprehensive Waiver"). Comprehensive Waiver participants were required to have service providers. Thus, Clients would not have been allowed to live at Sterling Creek–or in any other community setting–if they did not have a service provider.

Defendants counter that Clients could–and did–continue to live at Sterling Creek after FirstCall's contract with KCRC ended and the company stopped providing supported services. Thus, Defendants argue Clients could live at Sterling Creek even if *FirstCall* specifically did not provide them supported services. However, the fact that Clients could not have lived at Sterling Creek without a service provider indicates that Clients' apartments were being maintained "primarily to facilitate the provision of assistive services." *Welding*, 353 F.3d at 1219. The fact that Clients could have lived at those apartments with a different service provider does not change this result.

**(5) The relative difference in cost/value of services provided and total cost of maintaining the living unit, including government subsidies**. This factor is

---

[4] Defendants assert that facts showing the extent of Clients' disabilities cannot be taken into account in determining whether Clients' apartments constituted private homes without violating the Americans with Disabilities Act (ADA), among other statutes. ADA prohibits disabled individuals from being excluded from participating in or being denied the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132. Defendants argument lacks merit because a determination that FirstCall employees were not exempt from FLSA's overtime provisions would not have the effect of denying Clients' participation in any public service, program, or activity.

7

> directly related to the purpose for which the living unit is primarily
> maintained. If the cost/value of the services is incidental to the other living
> expenses, that weighs in favor of it being a private home. If the cost/value
> of the services is a substantial portion of the total cost of maintaining the
> living unit, that weighs in favor of it not being a private home.

*Welding*, 353 F.3d at 1220. Here, the monthly cost of FirstCall's supported services ranged between approximately $4,000.00 to $9,000.00 per person, while Clients' monthly room and board expenses ranged between approximately $314.00 to $714.00 per person. Thus, the cost of the services provided was a substantial portion of the total cost of maintaining the living unit. This factor weighs against a finding that Clients' apartments were "private homes."

**(6) Whether the service provider uses any part of residence for the provider's own business purposes**. Although a service provider's use of an area for its own purposes indicates that the recipient of services lacks control over the premises, "[t]he service provider's use of an area to maintain items that are specifically for the client's care . . . does not weigh against it being a private home." *Welding*, 353 F.3d at 1219. Here, FirstCall maintained forms and a fax machine in Clients' apartments, but since these were for Clients' care, they do not weigh against the apartments being private homes. FirstCall also placed its policy and procedure manuals in the apartments so that it could become accredited by an organization. Although these manuals were not directly related to Clients' care, nothing indicates that their presence was anything other than de minimis. The Court holds that this factor does not weigh in favor of a finding that the apartments were "private homes."

In addition to the six factors just discussed, the Secretary also supports its position with several additional factors, most of which have merit.[5] For example, the fact that FirstCall employees had keys to Clients' apartments is contrary to what one

---

[5] The Court rejects the Secretary's contention that FirstCall's status as a for-profit business that made a profit on its contract with KCRC is relevant to the issue whether Clients' apartments at Sterling Creek were private homes.

8

would expect in a private residence. *See Linn v. Developmental Services of Tulsa, Inc.*, 891 F. Supp. 574, 579 (N.D. Okl. 1995). The Secretary also notes that KCRC required all "Comprehensive Waiver" participants to have a roommate and all roommates to use the same service provider; these requirements are not what one typically would expect in a "private home" setting. In addition, the fact that no Clients had relatives living with them weighs in favor of the Secretary's position. *See Johnston v. Volunteers of America, Inc.*, 213 F.3d 559, 565 (10th Cir. 2000). The Court further holds that the terminology FirstCall used in its documents (*e.g.*, stating that FirstCall had began the process of "acquiring" roommates for a resident) is evidence of FirstCall's role in managing the living arrangements at Sterling Creek.

After reviewing the factors discussed above, the Court is convinced that Clients' apartments at Sterling Creek were not "private homes" as that term is used in 29 C.F.R. § 552.3. The only reason Clients were not living in an institutional setting is because they chose to participate in the "Comprehensive Waiver," which resulted in them residing at Sterling Creek. Although Clients had superior rights to possession of the apartments, they would not have been able to live in the community setting if they did not have a service provider, and their freedom to choose their own living arrangements was curtailed by KCRC's program requirements. FirstCall employees possessed keys to the apartments–Clients could not exclude FirstCall from the residence. Moreover, FirstCall was responsible for ensuring that Clients' daily needs were met, and the cost of FirstCall's supported services greatly exceeded other expenses in maintaining the apartments. Under these circumstances, and mindful that the "companionship exemption" should be strictly construed, the Court holds that FirstCall's employees who performed supported services at Sterling Creek were not exempt from FLSA's overtime provisions because Clients' apartments were not "private homes."

B. Gray and Hilton Are "Employers" Under FLSA

FLSA only requires "employers" to pay overtime wages. *See* 29 U.S.C. § 207(a)(1). "Employer' includes any person acting directly or indirectly in the interest of

9

an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The Eighth Circuit has concluded that this definition of "employer" extends liability to an individual. *See Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002). Defendants Gray and Hilton argue that they are not individually liable for overtime wages because they are not "employers" under FLSA.

In *Goldberg v. Whitaker House Co-op.*, Inc., 366 U.S. 28, 33 (1961), the Supreme Court held that "the 'economic reality' rather than 'technical concepts'" should be the test of employment under FLSA and went on to hold that an employment relationship existed in that case in part because management had the right to hire or fire the workers. In *Wirtz v. Pure Ice Co.*, 322 F.2d 259, 263 (8th Cir. 1963), the Eighth Circuit ruled that if there was "a combination of stock ownership, management, direction and the right to hire and fire employees," the conclusion that a person was an "employer" under FLSA would be "well supported." In addition, the Eighth Circuit in *Fruco Const. Co. v. McClelland*, 192 F.2d 241, 244 (8th Cir. 1951) observed that "'[t]he usual test by which, in common experience, men determine the employer, is to ascertain who has authority on his own account to "hire and fire."'" (citation omitted). The court in *Fruco Const. Co.* also noted that "'[t]he essential characteristic of the master and servant relation is the retention by the employer of the right to direct and control the manner in which the work shall be performed.'" *Id.* (citation omitted).

The Court holds that both Gray and Hilton were "employer[s]" as that term is defined in 29 U.S.C. § 203(d). Gray and Hilton are the sole owners of FirstCall; Gray owns 49% of FirstCall and Hilton owns 51% of the company. The FirstCall Board of Directors consists of only two members, Gray and Hilton. Hilton is the President and Chief Executive Officer of FirstCall; her duties included contracting for services, establishing policies and procedures, and generally maintaining and operating the business of FirstCall. Gray is the Vice President and Chief Operating Officer of FirstCall; her duties included staffing duties as well as generally maintaining and operating the business. Significantly, both Gray and Hilton had the authority to hire, discipline, and fire employees, and both individuals informed employees at the time of hire that they would not be paid overtime for hours worked over 40 in a workweek.

10

Also, after DOL informed Gray and Hilton in 2006 that FirstCall employees who worked at Sterling Creek were entitled to overtime, it was Gray and Hilton who made the decision to pay some of the employees retroactive pay for a period of approximately 4 months. And it was both Hilton and Gray who made the decisions, following DOL's investigation, to pay overtime to the employees who worked at Sterling Creek for a short period of time—and then to stop paying overtime to those same employees. Under these circumstances, Gray and Hilton qualify as "employer[s]" within the meaning of 29 U.S.C. § 203(d).

### C. Injunctive Relief Is Appropriate

Pursuant to 29 U.S.C. § 215(a)(2), it is unlawful for any person to violate FLSA's overtime provisions. When § 215 is violated, district courts are authorized to enter injunctive relief. *See* 29 U.S.C. § 217. Here, the Secretary seeks two types of injunctive relief against Defendants: a restitutionary injunction and a prospective injunction. Defendants argue neither injunction is appropriate.

#### *(1) Restitutionary Injunction*

When a person fails to pay overtime as required by FLSA, district courts have jurisdiction to enter a restitutionary injunction restraining the withholding of payment of overtime compensation found by the court to be due to employees. 29 U.S.C. § 217. Defendants argue a restitutionary injunction should not be entered against them because they conducted research and made an "educated determination" that their employees were exempt FLSA's overtime requirement. Defendants cite no authority for this argument, which essentially is that they acted in good faith. Good faith is not a valid basis for denying a restitutionary injunction. *Marshall v. Van Matre*, 634 F.2d 1115, 1118 (8th Cir. 1980).

Again relying on their alleged good faith, Defendants claim that the Court should not grant the Secretary's request for prejudgment interest on the award of overtime

11

wages.  However, like the payment of overtime itself, good faith is not a valid basis for denying a request for prejudgment interest.  *Brennan v. Maxey's Yamaha, Inc.*, 513 F.2d 179, 183 (8th Cir. 1975).  Defendants further contend prejudgment interest should not be awarded because they are no longer in the business of provided supported services, citing *U.S. Dept. of Labor v. Shenandoah Baptist Church*, 707 F. Supp. 1450, 1463 (W.D. Va. 1989).  However, *Shenandoah Baptist Church* stands for the proposition that good faith can justify denial of prejudgment interest *when the court does not order back wages to be paid*.  *Id.*  Here, Defendants must pay back wages to their employees.  The fact Defendants may no longer be providing supported services is not a basis for denying prejudgment interest.

Turning back to the issue of the restitutionary injunction as a whole, Defendants assert that summary judgment should be denied because the Secretary has not established its right to the *amount* of an award.  The Secretary claims that it has calculated Defendants' overtime wage liability to be $95,904.53.  However, the Secretary has not set forth uncontroverted facts demonstrating Defendants owe this particular amount.  As a result, a hearing must be held to determine the amount of back wages Defendants owe.

*(2) Prospective Injunction*

"Prospective injunctions are an essential tool to effectuate the policy of the FLSA because the cost of compliance is placed on the employer rather than the employee or the government."  *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997).  Prospective injunctions merely require employers to comply with the law and do not place any unjustified hardship on employers.  *See Goldberg v. Kickapoo Prairie Broadcasting Co.*, 288 F.2d 778, 783 (8th Cir. 1961).

Defendants first claim a prospective injunction is unwarranted because they are no longer providing companionship services at Sterling Creek.  The Eighth Circuit has held that "[w]here the Secretary has established violations of [FLSA], the district court should ordinarily grant injunctive relief, even if the employer is in present compliance,

unless the district court is soundly convinced that there is no reasonable probability of a recurrence of the violations." *Marshall*, 634 F.2d at 1118. Here, Defendants assert there is "no reasonable expectation that Defendants will engage in the complained conduct in the future." Although the basis of this assertion is unclear, Defendants listed as one of their uncontroverted facts that "FirstCall has no intention to provide [supported services] in the future." However, while Defendants' stated "intention" is to not provide supported services in the future, there is certainly nothing to prevent Defendants from engaging in this business at a future date. Defendants' declaration of intent–without more–is not enough to convince this Court that there is "no reasonable probability of a recurrence of the violations."

Gray and Hilton also contend injunctive relief is unnecessary against them, citing *Helena Glendale Ferry Co. v. Walling*, 132 F.2d 616, 620 (8th Cir. 1942). In that case, the Eighth Circuit affirmed a denial of an injunction against an individual employer because he was subject, as agent, to the commands of a corporate injunction, which expressly restrained the company, its agents, servants, and employees and all claiming to act upon its behalf. However, in *Chambers Const. Co. v. Mitchell*, 233 F.2d 717, 724-25 (8th Cir. 1956), the Eighth Circuit distinguished *Helena Glendale Ferry Co.* and affirmed an injunction entered against an individual employer even though he was also subject to a corporate injunction as an agent. According to the court in *Chambers Const. Co.*, it was not an abuse of discretion "to preclude the possibility that one might circumvent the force of the court's action by some possible means which is not evident or threatened but only feared." *Id.* Here, Gray and Hilton easily could circumvent a corporate injunction by dissolving FirstCall and forming a new corporation performing supported services disabled individuals. Moreover, a prospective injunction would only require Gray and Hilton to do what they are obligated to do anyway– comply with the law. Accordingly, a prospective injunction against Gray and Hilton is appropriate.

III. CONCLUSION

The Secretary's motion for summary judgment is granted in part and denied in

13

part. Defendants' motions for summary judgment are denied. A bench trial will be held January 4, 2010, at 9:00 a.m., to determine the amount of the restitutionary award that should be entered against Defendants.

IT IS SO ORDERED.

                                                     /s/ Ortrie D. Smith
                                                 ORTRIE D. SMITH, JUDGE
DATE: November 18, 2009                    UNITED STATES DISTRICT COURT